**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**CONSTANCE L. COLLIER,**

       **Plaintiff,**                         **CIVIL ACTION NO. 08-11712**

vs.

                                            **DISTRICT JUDGE JOHN FEIKENS**

**COMMISSIONER OF**                 **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

**I.**    **RECOMMENDATION:**    This Court recommends that Defendant's Motion for Summary Judgment (docket no. 9) be GRANTED, that Plaintiff's Motion for Summary Judgment (docket nos. 7) be DENIED, and that Plaintiff's Complaint be DISMISSED, as the ALJ's decision is supported by substantial evidence.

\*\*\*

**II.**    **PROCEDURAL HISTORY:**

Plaintiff filed an application for Supplemental Security Income on January 21, 2004 and Disability Insurance Benefits and a period of Disability on February 18, 2004, alleging that she had been disabled and unable to work since September 26, 2003 due to chronic bronchial asthma. (TR 43-46, 57, 60, 232-34). The Social Security Administration denied benefits. (TR 33-37). A requested *de novo* hearing was held on September 26, 2006 before Administrative Law Judge (ALJ) Michael A. Wilenkin who subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits or eligible for Supplemental Security Income because she

was not under a disability at any time through the date of the ALJ's January 12, 2007 decision. (TR 22, 241). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 5-7). The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

### III. PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

#### A. Plaintiff's Testimony

Plaintiff was 39 years old at the time of the hearing. (TR 244). Plaintiff has a high school education and vocational training in word processing. (TR 245). Plaintiff's most recent employment was performing clerical work. (TR 246). Plaintiff also has past work experience performing temporary clerical work and as a waitress and cashier. (TR 246, 247). Plaintiff testified that her most recent employment ended because she did not report to work when she was incarcerated in October 2003. (TR 247). Plaintiff also stated that she was not attending work prior to that date due to her asthma. (TR 248). Plaintiff lives with her three children and her fiancé drove her to the hearing. (TR 244-45). Plaintiff testified that she does not drive because she gets nervous, panics and cannot concentrate. (TR 245).

Plaintiff treats her asthma with three bronchodilaters including Asthmacort, Advair and an emergency inhaler. (TR 252). Plaintiff also treats with a nebulizer. (TR 252-53). Upon initial questioning Plaintiff testified that she uses the nebulizer ten times per day. (TR 253). She later testified that on a typical day she uses it three or four times. (TR 254). Plaintiff also takes Singulair. (TR 254). Plaintiff testified that she stopped smoking three to four years prior to the hearing. (TR 254-55). The ALJ pointed out at the hearing that Plaintiff's doctor's records showed that Plaintiff

was smoking five cigarettes per day. (TR 256). Plaintiff testified that "That's not really smoking cigarettes . . . . Smoking cigarettes to me is considered like at least a pack or two a day, which is what I was doing prior to that." (TR 256). Plaintiff testified that it had been "some years" since she used heroin and in 2003 she started methadone treatment. (TR 256).

Plaintiff testified that she wakes up every hour and a half to two hours throughout the night due to asthma attacks. (TR 248). She is also bothered by urinary urgency during the night. (TR 248-49). Plaintiff treats her asthma attacks with the inhaler and if that does not work, she takes Albuterol through a nebulizer. (TR 249). Plaintiff testified that the Albuterol causes shaking. (TR 249). Plaintiff states that the asthma causes wheezing, shortness of breath, tightness in her back and, if she has a cold, coughing. (TR 250). She alleges that she suffers from fatigue from trying to breath. (TR 250).

Plaintiff testified that she sees a psychiatrist and a therapist who are trying to find the right medications to treat her emotional difficulties. (TR 257). At the time of the hearing Plaintiff was taking Prozac, Seroquel, Effexor, and Zyprexa. (TR 257). Plaintiff testified that the sleeping medication sometimes results in her urinating in her sleep. (TR 259). Plaintiff states that because of her depression she does not like to be around people and she has continuous and unprovoked crying spells that may last all day. (TR 260). Some days Plaintiff does not get out of bed or bathe. (TR 261). Plaintiff states she developed paranoid thoughts about a year and a half prior to the hearing and she loses track of what she is talking about in a conversation. (TR 262-63).

Plaintiff testified that she does not clean or do chores around the house. (TR 263). She participates in no recreational activities or hobbies but she watches television. (TR 263). Plaintiff stated that she can only walk 100 feet before she has shortness of breath and has to stop and rest. (TR 264). Plaintiff testified that she can stand for only five minutes before her back hurts, she has

3

shortness of breath, she feels panicked and, sometimes, the room spins yet she can sit "forever" without a problem. (TR 265). Plaintiff testified that she does not stoop, kneel, bend over, or use stairs due to shortness of breath and the possibility that she may have a dizzy spell. (TR 268). Plaintiff testified that she lies down all day. (TR 270). She testified that she cannot use her hands because they shake and she cannot lift a two-pound box of sugar, because she does not "pick up anything." (TR 268-69).

### B.     Medical Evidence

### 1.    *Evidence of Physical Impairments*

The medical evidence reveals that Plaintiff received multiple treatments for asthma from January 2003 through August 2006. (TR 110-231). The record shows that from 2003 through 2005, Plaintiff reported to the emergency room five times and was admitted to the hospital multiple times due to exacerbated asthma symptoms. Plaintiff reported to the emergency room on January 6, 2003 with shortness of breath for the prior two days and cold and flu symptoms. (TR 100-003). Plaintiff was treated with Albuterol, Prednisone and Atrovent and discharged home in stable condition. (TR 103).

On February 14, 2003 Plaintiff reported to the emergency room with complaints of asthma exacerbation which Plaintiff reported was set off by a cold and upper respiratory tract infection. (TR 104). Plaintiff reported taking Combivent, Advair and Flonase but they were ineffective. (TR 104). Plaintiff reported that she had also been "doing" crack cocaine the evening before and it seemed to make her asthma worse. (TR 104). Plaintiff was diagnosed with asthma exacerbation and cocaine abuse. (TR 104). Plaintiff was treated with Albuterol, Atrovent and Prednisone. (TR 105). Plaintiff was admitted to the hospital following treatment. (TR 105-06). Surinder Mendiratta, M.D., reported that Plaintiff was "still smoking cigarettes." (TR 109-10).

4

On April 1, 2003 Plaintiff reported to the emergency room with complaints of shortness of breath and reported that she had run out of her medications Advair and Combivent. (TR 121). Plaintiff reported significant improvement after one breathing treatment. (TR 121). Her peak flow after the first treatment was 300 and on reassessment Plaintiff had no wheezing. (TR 122). The reports indicates that Plaintiff smokes. (TR 122). Plaintiff was discharged in stable condition with Prednisone and given prescriptions for Advair and Combivent. (TR 122). On April 3, 2003 Plaintiff was admitted to the hospital to treat aspiration pneumonia. (TR 125). Plaintiff had a primary diagnosis of asthma and secondary diagnoses of aspiration pneumonia, asthma exacerbation, drug withdrawal syndrome, anxiety state, essential hypertension and contact dermatitis. (TR 125). In the discharge summary Dr. Mendiratta noted that Plaintiff has a "chronic history of noncompliance and still smoking." (TR 125). The chest x-ray revealed no infiltrate, effusion, cardiomegaly, pneumothorax or failure. (TR 128). A monitor and EKG revealed sinus tachycardia. (TR 128). Plaintiff was placed on antibiotics, underwent a CT scan of the chest, was seen by a pulmonary physician and was discharged in stable condition on April 10, 2003. (TR 125).

Plaintiff reported to the hospital on August 6, 2003 with exacerbation of her asthma. (TR 135). In the Final Report it was noted that Plaintiff "does smoke tobacco." (TR 135). The attending physician noted that Plaintiff was sleeping and in no acute distress when he initially saw her. (TR 135). Plaintiff was treated with Albuterol and Prednisone. (TR 136). Plaintiff was stable and was discharged. (TR 136).

Plaintiff was admitted to the hospital from January 8 through January 12, 2004 for asthma exacerbation. Plaintiff was admitted due to a poor response to treatment with Albuterol and Atrovent. (TR 140). Again it was noted that Plaintiff "smokes cigarettes." (TR 139). The report notes that Plaintiff reported that she had been out of her medication "for sometime" but she had her

albuterol inhaler. (TR 138). Dr. Mendiratta noted that Plaintiff was in for "noncompliance and also shortness of breath." (TR 141). Plaintiff was treated for pneumonia, bronchitis and asthma exacerbation. (TR 141). On January 11, 2004 Plaintiff tested positive for opiates. (TR 111).

Plaintiff reported to the emergency room on February 18, 2004 with difficulty breathing. (TR 145). The emergency physician reported that Plaintiff was sleeping and resting comfortably when he initially saw her. (TR 145). Plaintiff was treated with Albuterol and Atrovent and discharged in stable condition. (TR 145-46). A chest x-ray revealed "some left lower lobe atelectasis" and mild pulmonary vascular congestion. (TR 146-48). On May 25, 2004 Plaintiff was admitted to the hospital after presenting to the emergency room and failing to respond to bronchodilators and Prednisone. (TR 153-62). Plaintiff was diagnosed with severe obstructive asthma with respiratory failure, hypertension and bronchitis. (TR 154). Plaintiff was intubated. (TR 154). Plaintiff was discharged on June 1, 2004. (TR 153-175). Plaintiff was again admitted from June 3 through June 7, 2004 for shortness of breath and wheezing. She was diagnosed with critical care polyneuropathy and myopathy, asthma, steroid induced increase in blood sugar and hypertension. (TR 176). It was noted that Plaintiff was positive for smoking and was on methadone for previous heroine use. (TR 177). Ranjini Sathyadev, M.D., the attending physician, noted that Plaintiff was "independent with all activities of daily living and mobility" prior to admission. (TR 176). Plaintiff was transferred to inpatient rehabilitation where she "progressed rapidly" and was "modified independent with gait, basic activities of daily living and transfers." (TR 177). She was able to ambulate household distances and use stairs with modified independence. (TR 177). At the time of discharge she used a standard cane to ambulate. (TR 177). Her discharge medications were Combivent, Cardizem, Vasotec, Advair Discus, Hydrodiuril, Protonix and three short courses of Prednisone. (TR 177).

Plaintiff was admitted to the hospital from March 15 through March 21, 2005 for asthma exacerbation. (TR 193). Plaintiff had reported to the emergency room the day before and was treated with steroids and antibiotics. (TR 193). Plaintiff reported using her albuterol inhaler ten times per day at home. (TR 193). The report notes that Plaintiff smokes five cigarettes per day. (TR 193). Plaintiff "was slow to improve while in the hospital" and was treated with Solu-Medrol, Levaquin and breathing treatments. (TR 194). Plaintiff was noted to have new onset diabetes, was discharged with medication, given diabetic education and advised to quit smoking because of the adverse effects on her health and the affect on her son's asthma. (TR 194).

Plaintiff was last admitted to the hospital for asthma exacerbation from September 28 through October 3, 2005. (TR 205-07). Plaintiff's breathing "improved" during her stay and she was discharged with the instruction "activity as tolerated." (TR 206). The Discharge Summary stated that Plaintiff has a "history of 20-year smoker, 1 pack per day." (TR 205).

The record shows that Plaintiff also received treatment for her asthma with Noel H. Upfall, M.D., from November 2004 through February 2006. (TR 212-222). On three occasions between December 2004 and October 2005 Dr. Upfall advised that Plaintiff "needs to stay away from all smokers." (TR 216, 219, 221). In January 2006 Dr. Upfall noted that Plaintiff "is around smoking." (TR 212).

## 2.    *Evidence of Mental Impairment*

On November 30, 2004 Plaintiff underwent an intake interview with a social worker at Eastwood Clinics. (TR 198-99). The social worker noted that Plaintiff "presented with several clusters of symptoms" related to depression, anxiety and psychosis. (TR 198). The social worker diagnosed Plaintiff with major depressive disorder with psychosis (Code 296.34). (TR 199). The therapist noted that Plaintiff's short-term and long-term memory were impaired, her judgment and

7

impulse control were "fair," her insight and motivation were "good," her thought process was "confused," she was oriented times three, and her intelligence was adult appropriate. (TR 198). On November 30, 2004 Plaintiff was diagnosed with a Global Assessment Function ("GAF") of 25-30. (TR 199). On December 2, 2004 Dr. Upfall noted that Plaintiff presented with manic depression and "needs some type of medicine, but she has not started it yet." Plaintiff underwent a psychiatric evaluation on December 13, 2004 with Pretti Venkataramen, M.D., who diagnosed depressive disorder and dysuria and concluded that Plaintiff had a GAF of 50. (TR 200-04). In February 2005 Dr. Upfall noted that Plaintiff "needs to see the psychiatrist." (TR 220). Plaintiff was discharged from Eastwood Clinics on June 16, 2005 following the assessment and four sessions which ended on April 25, 2005. (TR 196). Plaintiff was diagnosed with a GAF of 40-45. (TR 196). The therapist noted that Plaintiff made little progress because she was unable to attend appointments due to frequent hospitalization and illness. (TR 196).

In January 2006 Dr. Upfall diagnosed depression and anxiety and noted that Plaintiff was to take Prozac and Catapres and see a psychiatrist. (TR 213). Plaintiff resumed therapy on January 19, 2006 when she was diagnosed with recurrent major depressive disorder (Code 296.32) and a GAF of 45. (TR 229). The therapist noted that Plaintiff's short and long-term memory were intact, intelligence was adult appropriate, judgment and insight were fair, impulse control was fair to good, motivation was good, thought process was sequential and she had an increase in paranoia. (TR 228). On March 21, 2006 Plaintiff was diagnosed with a GAF of 40. (TR 226). On July 18, 2006 Plaintiff was diagnosed with a GAF of 50. (TR 224). Plaintiff continued to be prescribed Prozac. (TR 224).

### C. Vocational Expert Testimony

The Vocational Expert (VE) classified Plaintiff's past work as a data entry clerk as semi-skilled with sedentary exertion, an office clerk as semi-skilled with light exertion, a health aide was

semi-skilled with medium exertion, a waitress was semi-skilled with light exertion and a cashier was unskilled with light exertion. (TR 374). The VE testified that if Plaintiff's self-described limitations were accurate, she would not be able to do her past work or any other work. (TR 275). Work would be precluded by her need to lie down all day and the combination of her crying spells, difficulty being around people, limited walking and standing, shaking hands and inability to lift more than one pound. (TR 275).

The ALJ asked the VE to consider a person of Plaintiff's age, education and past work experience, who is able to sit for six hours of an eight-hour work day, stand or walk for two hours of an eight-hour workday, lift up to ten pounds occasionally and less weight more frequently, has a history of significant manic bronchitis, should not be required to engage in prolonged or protracted walking, should not climb stairs or ladders, use her arms above her head or shoulders, engage in excessive or forceful and repetitive pushing, pulling, stretching or reaching, or engage in repetitive stooping, squatting, kneeling, crouching, bending or other similar activities, and should not be exposed to any more than minimal to mild concentrations of atmospheric irritants such as dust, smoke, fumes and noxious odors. (TR 275-76). The ALJ also asked the VE to assume the individual has depression limiting her to simple, routine and repetitive tasks, cannot perform work where the pace is dictated by an external source, such as assembly line or conveyor belt work, contact with supervisory personnel and co-workers should be minimal, no contact with the general public in the performance of the work, no requirement to perform activities requiring significant fine dexterity and manipulation in consideration of the tremor in both hands secondary to medication, and to assume that the deficits suffered by Plaintiff and the treatment modalities are the same. (TR 276). The VE testified that such an individual could not perform Plaintiff's past work. (TR 277). The VE stated that there would be a limited number of inspection packaging and sorting jobs

available numbering 1,000 inspection jobs, 1,000 packaging jobs and 1,000 sorting jobs available in the Southeastern Detroit metropolitan area and twice as many available statewide. (TR 277). The VE stated that this testimony is consistent with the Dictionary of Occupational Titles. (TR 277).

## IV.     ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through the date of the January 12, 2007 decision, had not engaged in substantial gainful activity at any time relevant to the decision, suffered from asthma, depression and a history of substance abuse, all severe impairments, she does not have an impairment or combination of impairments equal to the Listing of Impairments. (TR 16). The ALJ found that Plaintiff is unable to perform her past relevant work but concluded that she has the residual functional capacity to perform a limited range of unskilled sedentary work and is capable of performing a significant number of jobs in the economy. (TR 20-21). Therefore, she was not suffering from a disability under the Social Security Act at any time through the date of the ALJ's January 12, 2007 decision. (TR 21-22).

## V.     LAW AND ANALYSIS

### A.     Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts

in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B. Framework For Social Security Disability Determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)  she was not presently engaged in substantial gainful employment; and

(2)  she suffered from a severe impairment; and

(3)  the impairment met or was medically equal to a "listed impairment;" or

(4)  she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider her residual functional capacity ("RFC"), age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available

in the economy that the claimant can perform." *Her*, 203 F.3d at 391.  To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted). Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to evaluate medical evidence demonstrating that Plaintiff meets Listing 3.02(A), and the ALJ's RFC and hypothetical question to the VE did not accurately portray Plaintiff's limitations.

**C.     Analysis**

*1.     Whether The ALJ's Finding That Plaintiff Does Not Meet The Listing Is Supported By Substantial Evidence*

Plaintiff argues that the ALJ should have found that she meets Listing 3.02(A) because there is medical evidence showing that she had a forced expiratory volume (FEV) equal to or less than the values specified in the Listing. (Docket no. 7).  At step two, the ALJ found that Plaintiff had the following "severe" impairments: Asthma, depression and a history of substance abuse.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  (TR 16).  At step three the ALJ determined that these impairments do not meet or medically equal the listed impairments in the Regulations, Appendix I, Subpart P. (TR 16).  In order to establish disability under the Listings, each requirement of the applicable Listing must be met.  *See* 20 C.F.R. §§ 404.1525(d) and 416.925(d) ("Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis.  To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing.");

*see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria").

Category 3.02(A) of the Listing for impairments of the respiratory system requires "[c]hronic obstructive pulmonary disease, due to any cause, with the FEV-1 equal to or less than the values specified in table I corresponding to the person's height without shoes." Pt. 404, Subpt. P, App. 1 at 3.02(A). Plaintiff is sixty-four inches tall. (TR 182). An FEV-1 equal to or less than 1.25L would meet the Listing requirement. *See id.* at Table 1. The Listings specifically provide that "[t]he reported one-second forced expiratory volume (FEV-1) . . . should represent the largest of at least three satisfactory forced expiratory maneuvers." Pt. 404, Subpt. P, App. 1 at 3.00(E).

In support of her argument Plaintiff directs the Court to September 2, 2004 when her FEV-1 values were taken. Only one of the values on this date exceeds 1.25L. It is a before bronchodilator FEV-1 which is 1.50. The other results before bronchodilator are 0.94 and 0.60. Plaintiff was administered two puffs of bronchodilator Albuterol inhaler and the test was repeated after ten minutes. (TR 182). The record contains a statement affirming that Plaintiff exerted her best effort during testing. (TR 182). The post-bronchodilator FEV-1 numbers are 0.82, 0.72 and 0.93. (TR 182). "The largest value among the test results is to be used, whether that value is from the claimant's pre-bronchodilator or post-bronchodilator testing." *Gwidzala v. Comm'r of Soc. Sec.*, 191 F.3d 452, 1999 WL 777534 *4 (6th Cir. 1999). Therefore, the highest of the values is outside the range of disability. Although the ALJ did not list the values in his decision, this is harmless error because the value is greater than that necessary for a finding of disability under Listing 3.02(A).

*2.      Whether The ALJ's RFC and Hypothetical Question To The VE Accurately Portrayed Plaintiff's Physical And Mental Limitations*

Plaintiff argues that the ALJ did not consider her frequent and unplanned absences from work due to hospitalizations and ignored her GAF scores. The ALJ properly determined Plaintiff's RFC based on all of the medical evidence of record and found that she could perform "a limited range of sedentary work at the unskilled level" with further specified limitations. (TR 17). The ALJ properly referenced the regulations, Pt. 404, Subpt. P, App. 2 and relied on the VE's testimony to determine what effect Plaintiff's non-exertional limitations would have on the number of jobs available in the economy[1]. (TR 23).

Plaintiff alleges that the ALJ's hypothetical question should have included the effect of frequent unplanned absences. Plaintiff points out that she was in the hospital six different times for a total of thirty-one days during a two year period. (Docket no. 7 at 14 of 16). The ALJ specifically considered Plaintiff's hospitalizations and noted the instances when the record showed that Plaintiff was non-compliant with her medication and with the directive not to smoke. The hospital records for the following dates indicate that Plaintiff was still smoking cigarettes: February 14, 2003, April 1, 2003, April 3, 2003, August 6, 2003, January 8, 2004, June 3, 2004, March 15, 2005 and September 28, 2005. (TR 104, 122, 125, 135, 139, 177, 193, 205). On the April 1, 2003 emergency room visit Plaintiff reported that she had run out of medications Advair and Combivent. (TR 121). The report from Plaintiff's January 8, 2004 hospital admission notes that Plaintiff reported that she had been "out of some of her medications for sometime" but had her albuterol inhaler. (TR 138).

---

[1] The ALJ makes finds that Plaintiff was 36 years old on the alleged onset date which is defined as a "younger" individual under 20 C.F.R. sections 404.1563 and 416.963, has a high school education and is able to communicate in English and that transferability of skills is not material to the determination due to Plaintiff's age. (TR 21).

14

Her doctor specifically noted Plaintiff's "noncompliance." (TR 141). The record shows that Plaintiff was advised to quit smoking due to its effects on her health and that of her asthmatic son. (TR 194). Dr. Upfall advised Plaintiff on three occasions between December 2004 and October 2005 to avoid all smokers. (TR 216, 219, 221). The ALJ reasonably found that Plaintiff's compliance with her treatment "would have undoubtedly resulted in a substantial improvement of her pulmonary functioning." (TR 19). The ALJ noted which episodes were accompanied by noted non-compliance in the areas of medication and smoking. (TR 18-20). Therefore, the ALJ addressed the issue of Plaintiff's multiple hospitalizations and properly considered the effects of her non-compliance with medication and smoking.

Plaintiff also argues that the ALJ did not properly consider her GAF scores. Plaintiff calls the GAF scores and psychological evaluations in the record "work preclusive." (Docket no. 7). A GAF of 50-60 "indicates moderate symptoms or moderate difficulty in social, occupational or school functioning." *See Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 463 (6th Cir. 2006) (Claimant had GAF scores in the range of 21 to 60, with the majority of scores falling within the 50s and claimant was not precluded from a wide range of work or his prior work.). "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 502 n.7 (6th Cir. 2006). ("A GAF score may help an ALJ assess mental RFC, but it is not raw medical data.").

The ALJ followed the technique set forth in 20 C.F.R. sections 404.1520a and 416.920a to evaluate mental impairments and incorporated those findings into his written decision. *See* 20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2). (TR 13). The ALJ found that Plaintiff does not have

15

any marked limitations in the areas of activities of daily living, social functioning and ability to concentrate. (TR 16-17). The ALJ found that there is no evidence of episodes of decompensation. (TR 17). The ALJ set forth examples from the record which support his findings. (TR 17).

The ALJ cited extensively to the records containing the GAF scores, including records from Eastwood Clinics where Plaintiff was diagnosed with severe major depressive disorder. (TR 196-204). The ALJ pointed out that recent treatment records from Eastwood Clinics show that Plaintiff's memory was "intact" and her judgment "fair." (TR 20, 228). Furthermore, records from January 2006 indicate that her thought process was "sequential," her judgment and insight were "fair," her impulse control was "fair to good," and her motivation was "good." (TR 228). Notes from November 2004 show that Plaintiff's memory was "impaired" and her thought process "confused." (TR 198). Her GAF score as of July 18, 2006 was 50. (TR 224). This was an improvement over her June 2005 Discharge Summary at Eastwood Clinics in which she was assigned a GAF of 40-45. (TR 196).

The ALJ accounted for Plaintiff's mental limitations in his RFC and the hypothetical question to the VE by including limitations to unskilled work, minimal contact with co-workers, supervisors and the general public, simple routine tasks and no pace work. (TR 17). Plaintiff has not alleged specific symptoms or limitations which are not encompassed by the ALJ's hypothetical question and RFC. The ALJ's RFC is supported by substantial evidence. (TR 17). The ALJ's hypothetical question to the VE incorporated Plaintiff's limitations and the VE's testimony is substantial evidence supporting the ALJ's finding that Plaintiff can perform a significant number of jobs in the economy. (TR 21).

**CONCLUSION**

The ALJ's decision to deny benefits was within the range of discretion allowed by law, it is supported by substantial evidence and there is simply insufficient evidence to find otherwise. Defendant's Motion for Summary Judgment (docket no. 9) should be granted, that of Plaintiff (docket no. 7) denied and the instant complaint dismissed.

**REVIEW OF REPORT AND RECOMMENDATION**

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: March 06, 2009         s/ Mona K. Majozub
                              MONA K. MAJZOUB
                              UNITED STATES MAGISTRATE JUDGE

**PROOF OF SERVICE**

  I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: March 06, 2009     <u> s/ Lisa C. Bartlett </u>
                Courtroom Deputy